## THE COLUMBIA AND PORT DEPOSIT R. R. CO. *vs.* STATE Use of EMILY E. HUFF.

*Photographs as Evidence—Accident at Railway Crossing in the Country—Contributory Negligence of Driver of Wagon.*

In an action to recover damages for a death caused by collision with a train at a railway crossing in the country, a photograph of the place, taken three years after the accident, is not admissible in evidence when it is not shown that the place when photographed was in the same condition as at the time of the accident.

A country road crossed a railway track at an acute angle and the view of the track for some distance from the crossing was obstructed by trees and bushes. When a man driving a wagon slowly approaced the crossing and the heads of his horses were twenty feet from the track he was seen by the engineer of an oncoming train, running forty miles an hour, to be turning his horses towards the track and a danger signal was sounded. The train was then about 300 feet distant. According to the testimony of three of the eye witnesses, the driver, on hearing the warning, whipped up his horses in an attempt to cross in front of the train but was struck by the engine and killed. According to the testimony of the other eye witness, the horses became frightened by the whistle or by escaping steam and ran upon the track. *Held*, that the accident was occasioned by the negligence of the driver of the wagon, since, if he had looked or listened, as he should have done, he could have become aware of the train in time to avoid injury; and if he attempted to urge his horses over the track after hearing the danger signal he took the risk and at that time he could have halted before reaching the track; and if his horses became frightened and took him upon the track involuntarily, the railway company is not responsible for that effect of the signal, which it was the duty of the engineer to sound.

*Decided February 13th, 1907.*

Appeal from the Circuit Court for Baltimore County (VAN BIBBER, J.), where there was a judgment for the plaintiff for $9,000.

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Charles H. Carter* and *Shirley Carter*, for the appellant.

*D. G. McIntosh* and *J. J. Archer* (with whom was *James W. McNabb* on the brief), for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

The appeal in this case is from a judgment of the Circuit Court for Baltimore County, against the appellant railroad company for damages for the alleged negligent killing of the husband of the equitable appellee by one of its trains at a public crossing. The suit was instituted on April 20th, 1903, in Cecil County, and was from there removed first to Harford County and then to Baltimore County, where it was tried.

The declaration as originally filed averred that the defendant "so negligently and unskillfully drove and managed an engine and train of cars attached thereto upon and along its said railroad, which William H. Huff, the husband of Emily E. Huff, the equitable plaintiff, was then lawfully crossing, that the said engine and cars were driven and struck against the said William H. Huff, in consequence of which he died." On October 16th, 1905, the declaration was amended by leave of Court by inserting after the words "lawfully crossing" the expression "while in the exercise of due care." The defendant pleaded the general issue and that the action did not accrue within one year before the filling of the amended declaration. The plaintiff joined issue on the general issue plea and demurred to the plea of limitations and the Court sustained the demurrer.

There are two bills of exceptions in the record. One is to

the action of the lower Court on the prayers and the other is to its refusal to admit in evidence certain photographs of the scene of the accident which were taken' nearly three years after its occurrence. As we think, for reasons which we will state in this opinion, that the learned Judge below should have taken the case from the jury by granting the defendant's fifth prayer, it is sufficient to say in reference to the first exception that there was no error in refusing to admit the photographs in evidence as it was not shown that the *locus in quo* when photographed was in the same condition as at the time of the accident.

At the time of the accident which resulted in his death, the deceased was driving a two-horse wagon along the public road, leading from Rowlandville to Conowingo, in Cecil County, at its intersection with appellant's line of railroad. At or near the intersection of the two roads the line of the railroad runs almost north and south having a slight curve to the west, and, for nearly one thousand feet south of the crossing, the highway runs parallel to the railroad at the distance of about fifty feet easterly therefrom. A short distance south of the crossing the highway turns in toward the railroad which it crosses at an angle of about thirty-eight degrees. The intersection of the two roads is one thousand feet or thereabouts north of the railroad bridge over the Octorara Creek, and about a hundred feet south of the bridge there is a whistling post for this crossing.

The plaintiff's witnesses testified that at the time of the accident the space between the railroad track and the highway for some distance southerly from a point twenty-five feet south of the crossing was filled with so dense a growth of trees and bushes as to render trains running on the railroad invisible to persons passing along the highway until they had gotten beyond the bushes, and for that reason the witnesses regarded the crossing as a dangerous one. The witness Grub said you could not see a train "until right at the railroad and had to depend on your hearing altogether." A telegraph pole stood alongside the highway about fifty feet south of the crossing.

The defendant introduced evidence of an opposite character as to the extent of the obstructions to the view near the crossing, but for the purposes of this opinion the evidence on behalf of the plaintiff will be taken to be true.

At the time of the accident about half-past two o'clock in the afternoon Mr. Huff, who the evidence shows to have been a competent and careful driver but not very familiar with the locality, was driving northerly along the highway a pair of farm horses harnessed to an ordinary farm wagon, which had strips of board nailed across its top. The horses, which were not his own but borrowed ones, were ordinarily quiet but were afraid of steam. Directly behind Mr. Huff was Walter M. Grub driving a closed wagon and three or four hundred yards behind them were two other farm wagons, one driven by John Herman and the other by Fred. Webb, with whom was his employer, John W. Famous. All of these teams were returning from Rowlandville whither they had gone on the same day. As Mr. Huff was attempting to cross the railroad track his wagon was struck by one of the defendant's passenger trains which was running northerly at the rate of forty or forty-five miles an hour and he was fatally injured and died in a few minutes.

There were but four eye witnesses to the collision between the train and the wagon. They were Mr. Grub, who drove the wagon directly behind that of the deceased, the engineer Bernard and the fireman Schultz who were on the locomotive, and Mr. John N. Akers who was a passenger on the train. They differ in their recollection of some details but the portions of their testimony which agree or are free from contradiction furnish a fuller account of the accident than is ordinarily obtainable in such cases.

Grub, having testified for the plaintiff that he had passed over the crossing twice a week for twelve years and was familiar with it and that he was close to Mr. Huff when he was killed, was asked to tell the jury how the accident occurred. He replied "Well as we came up there Mr. Huff was ahead and I trotted my horses up and caught up near him and I

heard this train blow and then he was somewhere about the telegraph pole, and when I heard it blow I stopped and his horses got scared and took him right on over." In reply to further questions the same witness said "Well he (Huff) had been trotting before that and I trotted to catch up to him and he came to a stop right there at the telegraph pole." That he (witness) was right close to the telegraph pole when the danger signals were blown, just about up to Mr. Huff's wagon, which was just beyond, about the length of witness wagon ahead of him. At that time Mr. Huff was about thirty-two feet from the crossing and his horses were about eighteen or twenty feet from it and the engine was from eighty to one hundred yards from it. He further said that he did not see Huff stand up in the wagon when about to cross the tracks, that when Huff stopped witness' attention was drawn away to what he thought was a train coming from the north.

Bernard the engineer on the locomotive testified for the defendant that as near as he could tell he was about three hundred feet from the crossing when he blew the danger signals, and that he thought Huff was then about fifty feet from the crossing but he could not tell exactly. He further said : "I blew the whistle for this gentleman that was driving his team that I struck." * * "I noticed this team coming along here very slow walking, very slow, and an open wagon with one man sitting in it, and there is a road that leads over on this road that goes up, at that time there was quite a number of wagon tracks all along as though it had been used quite a long time. I didn't blow right there. I saw him make the start to make the turn say probably fifty feet, as far as I could tell at that distance, and I began to think he did not hear me or was not paying any attention and pulled right down on the whistle, the first whistle I blew and it came out good and strong, he jumped up and whipped those horses over the crossing ahead of me; as soon as I saw him brace up and put the whip to them, I thought he was going to one side and I slapped the brake on and opened the sand levers and it didn't

pick its wheels up; I think I did everything I could to stop it and kept on blowing the whistle and held right down on it thinking probably he would get over ahead of me; when I came up close to the crossing, he was standing on his feet and he looked right around, I could see him look right around in my face that I was so near to him, then the front of the engine cut the view from me and he got over on the fireman's side, he was so near to the front of the engine that it cut his view from me and I could not see him at all." The witness upon cross-examination adhered to this account of the accident.

Schultz, the fireman, testified for the defendant that when the danger signals were blown the engine was about three hundred feet from the crossing, that Huff and his wagon were then near the telegraph pole in plain view from the engine and that when the signal sounded Huff jumped up and raised his hand and struck with something and the horses which had been walking leisurely got out of that gait and moved faster and just as the horses had made the jump the front of the engine cut off witness' view and he did not see them again until they had cleared the rail on his side of the engine. Both the engineer and fireman said the train was running forty miles an hour when the danger signal sounded.

Akers, the passenger on the train, testified as follows: "I was sitting alongside of the window with window raised and when I heard the signal given I stuck my head outside of the window and seemed to be slight curve at that time, I could not see front of the engine but noticed there on the right two or three wagons going up the stream and I saw a two-horse wagon with a man sitting in it that looked as though he was just about down the curve; I could see the side of the wagon and the horse and those whistles were blown and think whistles were still blowing and think whistles were blown until almost struck the team; that is all that I can remember but when I saw the heads of the horses in the act of crossing the railroad I jumped up from the window I was sitting at and started across to the other side and that was last I saw of him until

I saw him lying there by the track * * * "When I made an effort to go over to the other side I was thrown against the front seat; the seat right ahead of me by the application of brakes or reversing of the engine." The witness further testified that Huff was standing up in the front part of his wagon using something to urge his horses.

Bernàrd, the engineer, Schultz, the fireman, Aker, the passenger, and three men, Hines, Baker and Gohn, who were working on the railway track near the Octorara bridge when the train passed, and Devonshire, a farmer who was at that time in a field adjoining the railroad, all testified positively and circumstantially for the defendant that they heard the engine blow for the crossing when it was still south of the bridge at or near the whistling post.

The plaintiff's witnesses Grub, Famous, Webb and Herman. who were in the wagons all testified that they did not hear the engine whistle south of the bridge and felt sure that they would have heard it had it been blown as they were listening for train signals as they drove their wagons along the highway. Famous further testified that he and Webb were talking to each other in the wagon and "the first noise to indicate anything of the train was a roaring noise in the bridge and out it jumped." Webb said that the first thing he and Famous saw or heard of the train was "as it just dashed out of the bridge."

As over against the positive testimony of so many different witnesses that they heard the engine blow for the crossing at the whistling post, the negative testimony of the plaintiff's witnesses that they did not hear the blast would be of doubtful legal sufficiency to send the case to the jury on that issue if it were an essential one. The real question in the case is not whether the whistle was blown at any particular point but whether those in charge of the train gave a proper and sufficient notice of its approach to the crossing. The law did not require them to blow a signal at the whistling post. The well-settled doctrine of this Court is that while railroad trains have the right of way at public crossings those in charge of the

trains must give all proper and sufficient signals of their approach and take every reasonable precaution according to the character of the crossing to avoid collision. The reciprocal duty of approaching the crossing with care is imposed upon travellers on the highway, and the more difficult and dangerous the crossing the higher is the degree of care required. It is negligence *per se* for any one to attempt to cross the tracks of a railroad without first looking and listening and also stopping for that purpose if the track in either direction is not fully in view at the immediate approach to the crossing. "And if a party neglect these necessary precautions and receives injury by a passing train which might have been seen if he had looked or heard if he had listened he will be presumed to have contributed by his own negligence to the occurrence of the accident and unless such presumption be repelled he will not be entitled to recover for any injury he may have sustained." *Hoagland's case,* 66 Md. 160; *Holden's case,* 93 Md. 420; *McNab's case,* 94 Md. 726; *Watson's case,* 91 Md. 354; *Roming's case,* 96 Md. 78–9; *Manfuso's case,* 102 Md. 257. And the one about to drive across the railway must continue to look and listen until the tracks, the real point of danger, are reached. *Meidling's case,* 97 Md. 73; *McNab's case, supra; Heying's case,* 100 Md. 283; *Keenan* v. *Union Traction. Co.,* 202 Pa. 107.

Tested by these familiar and well established propositions it is clear that the present case should have been taken from the jury by granting the defendant's fifth prayer which is as follows: "The defendant prays the Court to instruct the jury that there is no evidence legally sufficient in this case from which they can find that the accident complained of in this case which resulted in the death of said William H. Huff, the husband of the equitable plaintiff, was caused solely by any wrongful act, neglect or default of the defendant in this case or any of its servants or agents without any negligence on the part of the said William H. Huff directly contributing thereto, and therefore the plaintiff cannot recover in this action and their verdict must be for the defendant." Even if we regard

the affirmative evidence of the many witnesses as to the giving of the danger signal at the whistling post as contradicted by the failure of the plaintiff's witnesses to hear that signal and exclude it from our consideration, the sounding of the danger signal, as shown by all the evidence on that subject, when the train was eighty to one hundred yards from the crossing and the heads of the deceased's horses were about twenty feet from the track and he was in a place of safety gave to him a sufficient notice to enable him to halt his horses until the train went by.    In addition to that warning signal the plaintiff's witnesses, Webb and Famous, testified that the train made a roaring noise as it crossed and emerged from the Octorara bridge.    In *McNab's case, supra,* the plaintiff was held to be guilty of such negligence as debarred her from recovering damages, because she did not stop or back her horse but went forward when the horse was between the two tracks of a suburban electric railway and she saw a car forty feet distant approaching on the far track at a high rate of speed in the open country.    It is inconceivable that, if Huff had continued to listen with a proper degree of care as he approached the crossing of the railway track under the circumstances of the present case he would not have heard the approaching train in time to avoid a collision with it.    His failure to so listen constituted such negligence as to bar the recovery of damages by the plaintiff in this case.

Again if the testimony of three of the four eye witnesses of the accident, that when the danger signal sounded Huff urged his horses forward and tried to cross the track, be taken as uncontradicted with legal sufficiency by Grub's evidence, then the deceased deliberately accepted the risk which proved fatal to him.    If on the other hand Grub's testimony that, as soon as the danger signal was blown from the engine then about seventy yards behind the deceased, his horses got scared and took him right on over the track be taken as true, the railroad company was not responsible for the action of the horses.    It was the duty of the engineer to sound the danger signal when he saw the deceased turn his team in toward the railroad

track, and the company is not responsible for its effect on the horses.    Nor, if the plaintiff's theory that the horses were frightened by the steam from the engine so far in their rear be accepted, does that alter the case.    This Court has several times decided that a plaintiff cannot recover from a railroad company damages caused by his horses becoming frightened by steam escaping from its locomotives at a railway crossing there being no evidence that the escape of the steam was unusual or unnecessary.    *P., W. & B. R. R. Co.* v. *Burkhart,* 83 Md. 516; *Riley* v. *New York, &c., R. R. Co.,* 90 Md. 53.

For the error in rejecting the defendant's fifth prayer the judgment must be reversed without a new trial.

*Judgment reversed with costs without a new trial.*