# POLICE PENSION CASES.*

*Members of the police force of Baltimore City: pensions; special laws.*

Where there is no general law providing for or regulating pensioning members of the police force who may resign or be dismissed from the force, and no provision for the pensioning of police matrons, special laws providing for the paying of such pensions are within the discretion of the Legislature, and not in violation of Article 5, section 33 of the State Constitution, which prohibits the passage of special laws upon subjects covered by the general laws.                    pp. 320, 329

Where the general law provides for a pension to widows of such members of the Baltimore police force who may have been killed while engaged in the actual performance of duty, or who died in consequence of such injuries, a special law giving the Police Board authority to pay a pension to the widow of a member of the police force who succumbed to an attack of paralysis or of heart failure, while engaged in the performance of his duty, is valid.                    p. 327

The Code provisions conferring upon the Police Board of Baltimore City the discretion to pension members of the police force refer to the Board existing at the time, and there is no authority in succeeding Boards to determine whether they shall be continued.                    p. 324

In applying the provisions of the general law to cases of death while on duty, the Board of Police Commissioners should not be bound by purely technical rules.                    p. 328

*Decided June 28th, 1917.*

---

*The docket titles of these cases were: *The Board of Police Commissioners of Baltimore City* v. *Edith E. McClenehan, Wm. F. Gerwig, Manno A. Behrens, Geo. A. Grimes, Edward F. Meehan, Louis V. Paff, Louis F. Norris, Kate Spitznagle, Peter J. Patterson and Jos. J. Gilbert.*

Ten appeals in one record from the Superior Court of Baltimore City.   (AMBLER, J.)

The facts are stated in the opinion of the Court.

The causes were argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Albert C. Ritchie, the Attorney- General,* and *Ogle Marbury, Assistant Attorney-General,* for the Board of Police Commissioners.

*Isaac Lobe Straus,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

Ten cases were by agreement of the parties and with the consent of the Court bound in one record—the main questions being involved in all of them.   Each of the ten appellees filed a petition for a mandamus against the Board of Police Commissioners of Baltimore City to require that board to obey the provisions and directions of one or more Acts of the General Assembly of Maryland named in the petition, and to pay the petitioner the sum named in such Act or Acts. The main defense relied on in the answers was that the Acts were special laws prohibited by Article 3, section 33 of the State Constitution, and were therefore unconstitutional and void.   Agreed statements of facts were filed in the cases and the lower Court ordered a writ of mandamus to issue in each case, and gave judgment for the petitioner for costs.   Appeals from those several orders and judgments are now before us.

Chapter 459 of the Acts of 1886, being section 755 of Article 4 of the Local Code of 1888, provided that: "All sums of money which are now in, or which may hereafter come into the hands of the board of police commissioners for the City of Baltimore, under and by virtue of the provisions of existing laws, except such sums as may come into their hands under and by virtue of the provisions of section

728 shall constitute a fund to be known and accounted for as the special fund." That is section 776 of the New Charter and is under sub-title "Special Fund." Section 728 (747 of Revised Charter of 1915) referred to money received from taxes, and in case of a deficiency the board was authorized to issue certificates and raise therefrom a sum not exceeding $50,000 to meet the exigency. The board has large powers, including the appointment of the police force, detectives, matrons, etc.

Section 756 of Article 4 being the Act of 1886, Chap. 459, as amended by the Act of 1888, Chap. 306, provided that in addition to the sums of money authorized by law to be paid out of the Special Fund the Board, whenever in their opinion the efficiency of the service required it, were authorized to retire any officer of police, policeman, detective, clerk or turnkey appointed by them, and pay him out of said fund, in monthly instalments, a sum not to exceed one-third of the amount monthly paid to him at his retirement, provided he had served faithfully not less than sixteen years, or shall have been permanently disabled in the discharge of his duties, and the Board was required to procure and file among their records a certificate of a competent and reputable physician that the person proposed to be retired had been thoroughly examined by him and was incapable of performing active police duty, etc. That section was amended by several Acts so that as it is now in the revised charter of 1915 it provides for payment of a sum equal to one-half of that paid at retirement, provided he had served for not less than twenty years and some other changes were made. That section (756) in the new Charter of 1898 is on a different subject and section 777 is the number of the one relating to retirement of officers of police, policemen, detectives, clerks and turnkeys, but both sections 756 and 777 are in the Revised Charter. Section 756 in the Revised Charter requires those retired to perform such police duties as the Board requires, not to exceed seven days during any year, for which service no compensation is to be paid by the Board. Section

756A (Revised Charter) added by the Act of 1912, Chapter 189, authorizes the Board to retire any *officer of police, policeman, detective, clerk or turnkey* appointed by them who may be ineligible in the way of length of service to retirement on pay for life, as provided by section 756, and who has served faithfully and has become permanently incapacitated from active duty, and to pay him out of the Special Fund a sum not exceeding one year's salary allowed by law to him at the time of his retirement, provided a certificate is obtained from a majority of the police physicians of Baltimore City that he has been examined by them and that he is incapable of performing active duty.

Section 776 in the Revised Charter is the same as section 755 quoted above from Article 4 of the Code of 1888. Section 776A (Act of 1900, Chap. 266) makes the Board of Police Commissioners trustees of the Special Fund. Section 776C states in detail what the Special Fund shall consist of—amongst other things of two per cent. of the salary or pay of the police force entitled to participate in the Special Fund. It provides that it shall be optional with any member of the police force to contribute the two per cent., but that no member shall participate in the special fund unless he does so contribute. The confusion arising from having two sections of the Charter as much alike as 756 and 777 seems to have begun in 1898. The new Charter is Chapter 123 of the Acts of that session and in that what was section 756 of Article 4 in Code of 1888 was made section 777, but Chapter 494 of the Acts of 1898, evidently drawn before the new Charter was passed, in amending the provision for retirement referred to it as section 756. Then Chapter 233 of Acts of 1900, Chapter 81 of Acts of 1902, Chapter 391 of Acts of 1910 (p. 635) and Chapter 189 of Acts of 1912, continued to refer to it as section 756. Then Chapter 567 of Acts of 1912, which is the last Act signed, referred to the fact that Chapter 391 of Acts of 1910 had erroneously stated the section to be 756 in lieu of 777, the correct number intended to be amended, and repealed and re-enacted as 777.

It would seem therefore to be clear that section 777 as amended by Chapter 567 of Acts of 1912 is now the statute in force on the subject, and in so far as there is any conflict between it and what was called section 756 in above statute section 777 must prevail. It could not have been intended to have two such sections in the Charter. We need not therefore trouble ourselves with section 756, although there is not in the main much difference between them so far as can apply to this case excepting as to the time of service.

Section 777A (being Act of 1906, Chap. 456,) includes superintendent of matrons and matrons of station houses within the provisions of section 777, so that they may enjoy the same rights and privileges and benefits, subject to the same limitations and conditions, as those conferred for the retiring of members of the police force, provided they pay to the Special Fund $10 per annum for three years, in addition to the regular percentage required "under the Special Pension Act." Section 777B included the secretary and assistant secretary of the Board within the provisions of section 777, provided the secretary paid $300 and the assistant secretary $150 in three equal instalments to the "Special Fund." Section 777Ba (1900, Chap. 263,) directed the Mayor, etc., of Baltimore, upon the request of the Board, to appropriate annually a sum of money for the relief of disabled and superannuated members of the police force, and for the relief of widows and children of policemen killed in the discharge of duty, when the special fund was not sufficient for the payments authorized by the Act of the General Assembly heretofore passed. Provisions under the sub-title "Special Fund" are made in sections 776 to 780, inclusive, but we will not refer to the others. Having thus referred to what the appellant calls general laws on the subject, without deeming it necessary to enter upon a discussion as to whether they are general or special, and for the purposes of these cases assuming them to be general, we will now consider the several statutes passed for the benefit of the appellees.

### 1. Mrs. E. E. McClenehan.

The first case in the record is that of Mrs. McClenehan. She was appointed matron on January 28, 1900, and continued in that capacity until the 9th day of July, 1912, when she was dismissed by the Board, after an examination of physicians, who said she had Bright's disease and rheumatism, without any provision for future pay. She paid $30, being for the three years as required by section 777A, and the two per cent. of her salary from the year 1906 (when matrons were included) until she was dismissed. Chapter 600 of Acts of 1914, after stating in the preamble that she had contributed to the pension fund and was obliged to retire on account of serious illness, whereby she had been incapacitated from work and from earning a livlihood, directed the Board to pay her $7.50 a week during her life out of the Special Fund. She had not been in service for 16 years, as required by section 777. It is contended by the appellant that section 756A governs her case, and leaves discretionary with the Board, but it would seem clear that that section does not apply. That was passed in 1912, six years after matrons were given the privileges of section 777, but expressly limits the relief to "any officer of police, policeman, detective, clerk or turnkey," and does not include matrons. There was then no general law in existence when the Act of 1914 was passed, which included Mrs. McClenehan.

The question then is whether such an Act was in conflict with Article 3, section 33 of the Constitution. It provides that, "the General Assembly shall pass no special law for any case *for which provision has been made by an existing law."* It seems to us clear that the Board had no power under the "General Laws" in the charter to pension Mrs. McClenehan. As then they were not authorized to allow her a pension under those laws, it cannot be said that the constitutional provision above quoted prohibits the passage of such a statute as the one passed for her benefit. It may be that the Legislature was not willing to pass a general law allowing the

Board to pension matrons who left the service by reason of ill health, but were not permanently disabled in the discharge of their duty, and had not served the time required by Section 777—16 years. Indeed section 756A indicates that it deemed it proper to permit the Board to retire an "officer of police, policeman, detective, clerk or turnkey" appointed by them, who was ineligible in the way of length of service to retirement on pay for life, under the requirements of section 756, and had served faithfully and had become permanently incapacitated from active duty, but it was not willing to include matrons, and hence did not provide for their retirement by reason of sickness. It did not give them the benefit of the Special Fund at all until 1906.

There are many decisions of this Court which indicate that such a special provision for a particular person named as is made by this Act does not come within the prohibition. If there had been no such statute as section 756 or 777 we can see no reason why this Act could not have been passed, and if we are correct in the conclusion that neither of those statutes embraced her case, is it not just as if there was no such statute? In *Pumphrey* v. *Baltimore,* 47 Md. 145, the Act of 1876, Chap. 220, required the Mayor and City Council of Baltimore to take charge of and maintain as a public highway a bridge known as "Harman's Bridge." On their refusal to do so Pumphrey filed a petition for a mandamus to compel them to do so. Amongst other defenses this provision of the Constitution was relied on. This Court said, through CHIEF JUDGE BARTOL: "In the public local laws relating to Baltimore City, no provision is made for the acquisition of the bridge in question, and the ascertainment of the amount to be paid to the owners in the manner contemplated and directed by" former Acts referred to. It was held that the Act was constitutional and valid. In *O'Brian & Co.* v. *Co. Commrs. of Balto. Co.,* 51 Md. 15, the Legislature passed a special Act in reference to the opening of Wilkens avenue. The defense was taken that the General Laws provided a mode for the opening of any new road, or the widen-

ing, straightening, altering or closing up an old road. The Court said: "As recited in the preamble, 'there were special circumstances in the case of Wilkens avenue requiring special legislation in regard thereto'; and as the purposes of the Act could not be accomplished under any existing general law, its enactment was of course not within the prohibition contained in the Constitution. Art. 3, Sec. 33." In *Hodges v. Balto. Union Pass. Ry. Co.,* 58 Md. 603, it was held that as there was no general law conferring the rights, and prescribing the terms and conditions on which the defendant was to construct and operate its railway, on certain streets in the City of Baltimore, the Act then in question was not in conflict with this section of the Constitution. In *Gans v. Carter,* 77 Md. 1, it was contended that the powers given to the Fidelity & Deposit Company to become sole surety in all cases where two or more sureties were required, etc., was a special law, within the meaning of this section, but this Court held that as there was no general law providing for corporate security in such cases the Act was valid. See also *Revell v. Annapolis,* 81 Md. 1; *Baltimore v. United Ry. & E. Co.,* 126 Md. 39, and other cases where this provision of the Constitution has been passed on. The cases relied on by the appellant are clearly distinguishable from this. In *Prince George's County v. B. & O. R. R. Co.,* 113 Md. 179, there was a general law clearly covering the crossings involved. So in the case of *Baltimore v. Starr Church,* 106 Md. 281, the exemp'ion was invalid because the statute was within this provi/ion of the Constitution and for other reasons.

It is true that there are a number of sections in the Charter which relate to pensions for policemen and others, but they are only allowed on certain conditions. If a worthy person does not come within those provisions, it cannot be properly said that an Act can not be passed to provide for his or her case, any more than it can be successfully contended that the great amount of legislation which has been passed conferring special powers on corporations which were not granted by the general laws are invalid. That has been done over and over

again, without a suggestion that they were not valid. The General Corporation Laws of 1868 provided that, "No corporation shall possess or exercise any corporate powers except such as are conferred by law, and such as shall be necessary to the exercise of the powers so acquired." Art. 23, Sec. 56 of Code of 1888; Sec. 64 of Code of 1904. And it was oftentimes exceedingly doubtful whether a corporation had under the general laws some special power it desired to exercise, and hence numerous acts were passed to confer such powers. Sections 756 and 777 empower but do not require the Board to retire those provided for in them. It would be carrying the meaning of section 33 of Article 3 of the Constitution very far to say that by reason of such sections the Legislature could not pass an Act requiring the Board to retire on pay a certain person or persons which the Legislature thought should be retired. The Legislature never intended to abandon all control over the Board in such matters, as is shown by the many statutes on the subject. Of course when there is a general statute covering the particular case another question may arise, but we are satisfied that there is no difficulty in this case.

## 2. WILLIAM F. GERWIG.

The next case is that of William F. Gerwig. He was appointed on the police force October 21, 1899, and appointed a regular patrolman December 7, 1900. In January, 1904, whilst in the discharge of his duty, he sustained a fall, striking his spine on his revolver in his hip pocket. On September 6, 1904, he was dropped from the police force because of his injury and disability. It appeared to the Board then in office that the incapacity was produced by spinal trouble of long standing, and not from an injury occurring in the performance of his duty. By the Act of 1906, Chapter 63, it was provided: "That if the Police Commissioners of Baltimore City, after a careful examination are satisfied it is proper, they are hereby authorized and empowered to pay Mr. William Frederick Gerwig, a former policeman of the

police force of Baltimore City, out of the funds in their possession, or subject to their control, a weekly pension of nine dollars ($9.00), payable on the last day of each week." It is agreed that from and after the passage of that Act the Board regularly and continuously paid to him the sum of $9.00 a week until he received the letter of the secretary of the Board dated Septmber 8, 1916, notifying him that the Board considered the Act unconstitutional, and therefore would make no further payments to him. It is clear that there was no general law which covered his case.

It is contended, however, that the Act itself was not mandatory, but was in the discretion of the Board. While that is correct, the Board did exercise its discretion, presumably after careful examination as the Act provides. There is nothing in the Act to indicate that the intention of the Legislature was to leave it to the discretion of each Board from time to time, but having been acted on by the Board then in office it was not longer in the power of subsequent Boards to revoke it, merely as an exercise of their discretion. If that were so in refernce to what we speak of as the "Special Acts," it would likewise be so under section 777 and section 756, if that is still of any force. They leave it to the determination of the Board in the first place, "whenever, in their opinion the efficiencey of the service may require it, to retire any officer of police, policeman," etc., and they state the grounds upon which they may suspend payment or dismiss the party. It seems clear to us that it was left to the existing Board, and was not intended to leave it to the discretion of each succeeding Board as to whether the pay should be continued. Moreover, the action of the Board, as shown by the letter of the secretary, was upon the ground that the Act was unconstitutional, and it was not pretended that it was done under a claim of discretion in the Board.

### 3.   MANNO A. BEHRENS.

Behrens was appointed a patrolman upon the police force in 1879. It is admitted that he would have testified "that

upon the 21st day of August, 1899, the petitioner was virtually dismissed for partisan political reasons * * * without any provision for a pension or any other allowance." By Chapter 560 of the Acts of 1900 the Board was authorized and directed to pay pensions to the three persons named (including Behrens) "who were permanently disabled in the discharge of their duty as such policemen" out of the funds in their hands known and accounted for as the "Special Fund" the sum of $9.00 during the term of their respective lives. Then by the Act of 1916, Chapter 212, the Board was directed to pay Behrens for the rest of his life out of the "Special Fund" a weekly pension equal to one-half of the weekly pay of a regular patrolman, in lieu of any pension now being paid him under any law theretofore enacted. The Board having dismissed the petitioner he was not a member of the force and hence the Board could not place him on the pension list. He had served twenty years, faithfully as he claims, and was dismissed for "partisan political reasons" as shown by the agreed statement. There was no general law in force authorizing his reinstatement, and the Acts of 1900 and 1916 can not therefore be said to be contrary to Article 3, section 33 of the Constitution.

### 4.   George A. Grimes.

Grimes was a police officer from April 14, 1884, until November 11, 1906, when he was dismissed for being off his post and in an eating saloon for ten minutes. He had regularly paid the two per cent. of the salary received by him. By the Act of 1908, Chapter 192, the Board was directed to pay him a weekly pension of $9.00. That was paid until September, 1916, when he received the notice from the secretary that it would not longer be paid. There was no general law covering his case.

### 5.   Edward F. Meehan.

He was appointed a patrolman in 1881, Sergeant in 1886, and in January, 1896, a round sergeant. On July 12, 1897,

he was dismissed by the Board without any provision for pension. It was contended by him that he was innocent of the charges and was dismissed for partisan political reasons. By the Act of 1908, Chapter 92, the Board was directed to pay him $12.00 per week for life. It paid him regularly until September, 1916, when he was notified by the secretary that it would no longer be paid. We are informed by the appellees' brief that he has died since the decision below, and of course his representative will only be entitled to the amount due from the time the payments ceased until his death. No proceedings were taken to make his personal representative a party to this case, but we assume that will not be required by the appellant.

### 6. LOUIS V. PAFF.

He went on the police force June 1, 1888, and was employed as a driver of a patrol wagon. In July, 1890, he was run over by the patrol wagon and seriously injured. He suffered but continued to work from time to time until finally he became in such condition that he resigned. The Board accepted his resignation on May 10, 1898, without providing for any compensation. By Act of 1902, Chapter 280, the Board was authorized in their discretion to pay him $9.00 per week, and by the Act of 1914, Chapter 493, they were directed to pay him $10.00 per week. It is alleged that the first Act was discretionary. That is true, but the Board regularly paid him, until September, 1916, and what we have said above is sufficient as to that. Indeed, before he applied for the first Act he notified the Board of his intention to do so, and the Secretary replied that the Board had made inquiry as to his injuries and believed his was a worthy case and would do nothing to oppose legislation to put him on the retired list with pay. Apparently they only wanted the power which they thought they did not have.

## 7.  Louis F. Norris.

He was appointed a patrolman August 25, 1875, and he continued in service until February 2, 1887, when he was dismissed for being found asleep in a chair at 3:10 A. M. in a hotel upon his beat. On January 10, 1886, he fell on the ice while patroling his beat and dislocated his left arm at the elbow, since which time he was crippled. He was included in Chapter 560 of the Act of 1900, referred to in the case of Manno A. Behrens. After that Act he was regularly paid $9.00 a week until September, 1916. Having been dismissed there was no provision in the General Laws for reinstating him, so as to get the benefit of the pension, and he had not served the regular time.

## 8.  Kate Spitznagle.

She is the widow of Charles Spitznagle, who was appointed on the police force on January 1, 1893. He died suddenly December 25, 1905, after a long chase of a violator of the law—made in the performance of his duties—either from a stroke of paralysis or heart failure, as a result of the chase and arrest of the party. The records of the Police Board show that he died of paralysis. The petitioner did not make a formal request for an allowance, but the Acts of 1906, Chapter 335, authorized the Board, in their discretion, to pay her $9.00 per week during her life. That was paid her regularly until September, 1916. The only general law which could be claimed to cover her case is section 776D. That gives the Board power in its discretion to pay to the widow of a member of the Police Force who was killed while in the actual performance of duty, or who died in consequence of injuries received while in the discharge of duty, an allowance until she remarried. It is not necessary to determine whether it could be said that Mr. Spitznagle's death came within the intention and meaning of either of those grounds. It might well be questioned whether it did, but the Board paid the amount named in the Act regularly

from the time of its passage and does not object to the amount now, so far as the record discloses, but relies on the constitutional objection referred to in the other cases. Nor is it necessary to consider whether the fact that the Special Act provides for paying during her life, and section 776B only until she remarries. She is still unmarried, so far as the record shows. The Board in a worthy case should not be supposed to rely on purely technical reasons for granting or refusing such allowances. The object of the provision is to make the service more efficient, and if it be admitted that the Board had the discretion to allow a pension under section 776D, and as the record shows the Board did on April 23, 1906, grant her an allowance of nine dollars a week, it may well be said that it did so, acting within its discretion, and, of course, if that section does not apply, there can be no valid objection to the Act of 1906, from what we have already said.

### 9. PETER J. PATTERSON.

He served from September 12, 1886, to the 19th of February, 1913, when he was dismissed on the charge of having entered a saloon on other than police business, and remaining there twelve minutes, and while there drinking intoxicating liquor. He denies that he drank intoxicating liquor, but he was dismissed without an allowance or pension. He paid the two per cent. regularly while he was in service. By the Act of 1914, Chapter 486, the Board was directed to pay him a weekly pension of $11.00 per week, which was regularly paid until September, 1916. There was no general law covering his case, and what we have said in the other cases is sufficient to indicate our views.

### 10. JOSEPH J. GILBERT.

He was appointed as a patrolman January 27, 1881, as sergeant August 5, 1884, round sergeant April 19, 1894, lieutenant January 13, 1896, and on January 14, 1896, was

appointed captain. He was dismissed as he claims for partisan political reasons, on July 12, 1897, without any provision for pension. By the Act of 1904, Chapter 632, the Board was authorized to allow him a weekly pension of $15.00. That was paid regularly until September, 1916. We find no provision for allowing pensions when the Board dismisses, and hence there was no general law applicable.

We have thus gone at some length into these ten cases, and as we have above pointed out, we do not find any "general law" which can properly be said to interfere with the "Special Acts" referred to. We have already explained that we did not deem it necessary to discuss the point raised by the appellees that these Acts codified in the Local Code on this subject are not "General Laws" within the meaning of Article 3, section 33, because if they are admitted to be so, we find none of what we have spoken of as "Special Acts" coming within the prohibition of that section of the Constitution.

We are not called upon to speak of the wisdom of the Legislature in passing such Acts, although some of them would seem to be peculiarly meritorious and just. The parties had paid regularly into the Special Fund, which was intended for pensions and some other purposes. From the view we take of the Article of the Constitution relied on by the appellant, it becomes unnecessary to discuss any of the other questions raised. We will affirm all of the orders passed, including the Meehan case, as we have no record of his death of which we can take notice, and we assume that that will be adjusted without making his representative a party. If necessary of course that can be done.

*Order affirmed in each of the ten cases, the appellant to pay the costs.*