STATE, FOR USE OF BESSIE L. EMERSON *v.*
BALTIMORE & OHIO RAILROAD COMPANY

[No. 67, October Term, 1936.]

586

*Decided February 12th, 1937.*

The cause was argued before BOND, C. J. OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*J. Lloyd Harshman* and *Robert H. McCauley,* with whom were *Ellsworth R. Roulette* and *William M. Storm* on the brief, for the appellant.

*William P. Lane, Jr.,* and *Parsons Newman,* with whom was *Joseph D. Mish* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The action brought in the appeal at bar is for the use of the mother of Pearl V. Emerson, a young girl of sixteen years, who, while riding as a passenger for hire in a motor bus of Howard R. Poe, was killed by the collision of the bus and a through express train of the Baltimore & Ohio Railroad Company, a public carrier, at a highway railway crossing in Rockville. The defendants are the owner of the motor bus and the railway corporation. The case against both defendants was submitted to the jury, which rendered a verdict against the owner and one in favor of the corporation. The appeal is taken by the plaintiff.

The plaintiff asserts there is error in the adverse rulings on the testimony and the prayers; and the railroad company, one of the defendants, maintains the case should have been taken from the jury on its two refused prayers, on the theory that no primary negligence was shown on the part of the corporation. At the outset, it may be said that there was sufficient negligence shown on the part of the driver to charge the owner of the motor bus with legal responsibility for the accident. Furthermore, the young woman killed was a passenger for hire, who was without fault, and the negligence of the driver was not imputable to her. *Philadelphia W. & B. R. Co. v. Hogeland,* 66 Md. 149, 7 A. 105; *Balto., C. & R. Co. v. Turner,* 152 Md. 216, 228, 136 A. 609.

Under a local statute of Frederick County, where the case was tried, the exceptions reserved by both sides are for review on appeal, but not necessarily so when there is a reversal without a new trial. Code Pub. Loc. Laws (Flack) art. 11, secs. 84-86. *Ehrhart v. Board of Education,* 169 Md. 668, 182 A. 424. So, the chief questions are whether the testimony tended to show primary negligence on the part of the carrier, and, if so, was that question properly submitted to the jury by the granted prayers. There are also some subsidiary rulings on the testimony for consideration.

Howard R. Poe is a carrier for hire in the operation

of motor busses for the transportation of school children over the public highways of the state. While so engaged, his agent, on April 11th, 1935, drove a motor bus from Williamsport, Washington County, along a public highway, which crossed at grade in the municipality of Rockville, Montgomery County, the double railway tracks of the Baltimore & Ohio Railroad Company, a steam railway company engaged in the transportation of passengers and freight for reward. The long bus was filled with twenty-seven high school children in the care of their teacher. They were on their way to College Park, and reached, in the late afternoon, the south side of the railway crossing at Rockville, and drove northward to their destination, where they were to see a chemistry show and attend a lecture. The bus left Williamsport at 4:45 p. m. and arrived at College Park at 7:15 p. m.

After the close of the program at College Park, the bus and its passengers returned by the route they had come. The driver was on the left front single seat operating the bus. An aisle ran down the center the length of the bus with seven seats for two passengers on either side. The seats were occupied by two of the pupils on every seat, except one on which the teacher sat, with two of her pupils, back of the driver. Pearl Emerson was on the last seat, next to the window, on the left side. The fifth window on the left of the bus was partly open, as probably was another. The entrance to the bus was by a door, with a glass window, on the right side opposite the driver's seat. There was a window on the left, opposite to the driver's seat, and back of this window and the door on the right were a line of windows on each side of the bus.

The party left College Park about half past ten o'clock at night. It rained intermittently and as the bus approached the railway crossing it was drizzling enough to require the wiper of the windshield to be used. The driver had wiped off the moisture which had condensed on the windshield in the interior of the bus, and, except for the space in front of the driver which was kept clear by the

automatic wiper on the outside and by the driver on the inside, the rest of the windshield and the closed windows were covered with rain or moisture which obscured the vision.

The headlights of the bus were burning. After leaving College Park, the bus had been operated at a moderate speed, and the driver, who observed that he was approaching the railway crossing at Rockville, reduced the speed to ten or twelve miles an hour. He did not stop, but drove the bus at this speed south on the railway crossing. The driver increased the speed while on the crossing, and the bus had gone over the first or north and westbound track and had partly cleared the second or south and eastbound track, when a fast through train, which was running east on the south track, on time, and at the rate of fifty-eight or fifty-nine miles an hour, struck, on the crossing, the bus on its right side, about three feet from its rear. Eight children on the right rear seats of the bus, and six on the left rear side, were killed. Pearl V. Emerson was among them.

The accident occurred at about half past eleven o'clock. The teacher was awake and so were some of the students. They had traveled far and it was late. There was no singing, nor loud noise, nor was any one talking to the driver, and every one was seated. So, the passengers were doing nothing to divert the attention of the driver in the operation of the bus.

The driver knew of the railway crossing. The first notice he had of its proximity was given by the state highway commission, which had caused to be erected its standard railway crossing sign on the west side of the highway, so as to confront the traveler on the right lane of travel with a timely warning. From this point, as the bus continued to move southward towards the railway crossing, there were no buildings on the right or west of the highway to obstruct the view of the railway tracks to the west of the crossing, except a shed for waiting passengers and a tool shed. The passenger shed was 189 feet, and the tool shed 775, west of the western edge of

the macadam of the highway. Both sheds were about fourteen feet from the northernmost rail of the tracks, and were built parallel with the railway. The passenger shed fronted twenty-six feet on the railway tracks, and was nine feet wide and ten or eleven feet high. The tool shed faced 28.5 feet on the tracks and was ten feet four inches wide.

On the driver's right as he went south there was, along the west side of the highway, a bank whose crest along the highway was from four to five feet, until near the railway right of way it sloped abruptly to a level strip about fourteen feet wide, which extended westward along the northern rail of the westbound track. The general slope of the ground west of the highway was toward the railway, the surface was higher north of the passenger shed than at the roadside. The railway tracks west of the crossing extended 1,150 feet in a straight line, and then went towards the north on a curve into a railway cut. The distance between the north rail of the westbound track and the north rail of the eastbound track is 13 feet.

The effect of these physical conditions was that between sixty-three and twenty-six feet from the north rail of the westbound track the approach of a train west of the passenger shed could be observed as it came out of the railway cut when the observer was looking west back of the passenger shed in line with the opening between the two sheds, which, according to the testimony, would be momentary. At this station of twenty-six feet, the traveler's line of vision would extend diagonally in front of the passenger shed 525 feet west of the crossing along the eastbound track. From the twenty-six foot point in the highway southward the view back of the waiting station to the west was obstructed for twelve feet by the intervening width of the end of the station, so that the only portion of the track which was visible was included between the crossing and the intersection of the tracks by the prolongation of a line from the eye of the observer and the southeast corner of the passenger shed. As the observer moved southward, the view west was gradually

extended beyond the 525 foot point until when, at a distance of fourteen feet from the northbound rail of the westbound track, his vision was no longer obstructed to the west, by the side of the shed, and he had a clear view of the straight tracks to the west of at least 1,150 feet and 300 feet beyond on the curve.

On the west side of the highway and north of the crossing there was an upright post, with cross-arms. Diagonally opposite, on the east side of the highway and south of the crossing were a similar post and cross-arms. Below the cross-arms was a signboard parallel with the railway track and perpendicular to the highway. All were painted white, except that on the cross-arms were painted in large black letters the warning: "Railroad Crossing"; and that on the signboards were painted in bold black letters the plain notice: "No Watchman on Duty from 10:00 P. M. to 6:00 A. M." Under the signboard was a box, fourteen inches long, eight inches wide, and six inches deep, in which a lighted red lantern burned at night while the watchman was away. All these signs were on the right side of the road as the traveler on the highway approached the crossing. There was, also, in operation at the time of the accident, two electric crossing bells to give warning of an approaching train. Each bell was on a post, and one stood north and the other south of the tracks, and on the west side of the highway a few feet from the edge of the macadam. The bells began to ring when the approaching eastbound train was 3,578 feet west of the crossing. The crossing was illuminated by two electric street lights on the east side of the highway and close to the north and south boundaries of the railway.

From these facts, it appears that the driver of the bus had sufficient time to perceive and to avoid the dangers of the railway crossing.

The teacher was awake and gave the most intelligent account of the accident. She testified that she was looking and listening and that she did not see the train nor hear a whistle nor bell, but that she could not say the bell was not rung nor that the whistle was not blown, and that

just about the time the bus got to the cross-arm or eight to ten feet from the cross-arm of the railway signal on the north side of the railway right of way, which was eighteen feet from the railroad track, she thought she saw a flash of light like an airplane beacon, and then complete darkness. She noticed an automobile approaching from the opposite direction which came across immediately before the bus went on the crossing. After the bus was on the track, she saw the headlight of the train and heard the noise of the train as it came upon them. The headlight of the engine illuminated first the front of the bus where the driver was sitting and then, as the bus went forward, the front of the bus passed out of the shaft of light projected by the headlight of the engine and became dark, but the illumination continued in those sections of the interior of the bus which passed at an increased speed through the shaft of light cast by the headlight of the train. It is quite evident that the teacher did not look to the west after the bus had passed the front line of the passenger shed, because if she had, she would have seen the headlight of the train before its headlight streamed into the forepart of the bus. And, so, with the others in the bus who testified that they looked to the west and did not see, until immediately before the collision, the headlight of the train, which the testimony established was a powerful electric light, in good condition, that shone ahead like the shaft of an airplane beacon. The testimony of the teacher and of other witnesses produced on the part of the plaintiff is negative testimony that the bell on the engine and the bells at the crossing were not rung and the whistle was not blown as the train approached the crossing, but such testimony of inattentive or patently preoccupied witnesses will not prevail against the affirmative testimony of the actors who rang the bell and blew the whistle, and of the other and disinterested witnesses who, either as actors or observers, rang the bell or heard the bells ringing, and blew the whistle or heard it blowing. *Balto. & O. R. Co. v. Roming,* 96 Md. 67, 78-80, 53 A. 672; *Columbia & Port Deposit R. Co. v. State, use of*

*Huff,* 105 Md. 34, 40, 65 A. 625; *Klein v. United Rys Co.,* 152 Md. 492, 137 A. 306; *Western Maryland Ry. Co. v. Myers,* 163 Md. 534, 538, 163 A. 700.

If there had been, with this negative testimony, affirmative testimony that the signals had not been given, the question of whether the signals were given would have been an issue of fact for the jury, provided the positive statement is credible. *Northern Central Ry. Co. v. State, use of Gilmore,* 100 Md. 404, 415, 60 A. 19; *Balto. & O. R. Co. v. State, use of Black,* 107 Md. 642, 663, 69 A. 439, 72 A. 340. If the physical conditions were such that either the witness was not in a situation nor in circumstances certainly to see or hear, or if he had looked or listened when he must have seen and heard, his positive statement is either negative or incredible testimony. It is incredible that a witness looked down a straight track of at least 1,100 feet, and did not see a powerful headlight until almost the instant of collision. With respect to the signals, the testimony shows the witnesses, after an automobile ride from Williamsport, and a long evening's diversion, were returning home late at night in a rain or drizzle, in a heavy motor bus whose windows were closed, except one or two were down a short distance from the top, and whose operation was in the control of a driver provided for that purpose by the owner of the bus. Under these circumstances, the testimony given by the passengers with respect to the railway signals remains negative in nature. *Western Maryland R. Co. v. Myers,* 163 Md. 534, 537-539, 163 A. 700, *supra; United Rys. & Elec. Co. v. Crain,* 123 Md. 332, 340-351, 91 A. 405.

The driver of the bus was offered by the owner. The testimony is that the motor bus was equipped with hydraulic four-wheel brakes, with a "booster" brake to make the bus stop more quickly. At a speed of ten miles an hour, the bus could have been stopped in three feet. The driver noticed the red light at the crossing and slowed down to between ten and twelve miles an hour. The door of the bus was not closed tight at the top. He looked to the right and to the left for the approach of trains. An

automobile came over the crossing from the south before the bus was driven on the crossing, and the driver testified its headlights blinded him about ten feet from the track. He did not stop, although being blinded at this safe distance from the nearest track gave him another and imperative cause to stop, look, and listen. If he had stopped at the place he fixed in his testimony, he would have been absolutely safe, and, in the quiet, he would have heard the ringing of the crossing bells, and the signals and noise of the approaching train. The driver merely slowed to the speed of from ten to twelve miles an hour, and drove upon the crossing. He testified that he continued to look to the right and to the left, and that he heard neither crossing bells, engine bell, nor whistle and, although the windshield was clear, inside and out, in front of him, and the folding double door of the bus to his right when closed did not fit but had a narrow opening about three inches wide extending downward from the top about thirty inches, he did not know of the coming of the train nor did he see its light until he heard the engine bell after the bus was on the eastbound track, an instant before the impact and too late for him to avoid the accident, although he had immediately increased the speed of the bus.

On cross-examination the witness denied that he knew he was crossing the railroad track until the bus hit the first rail. Even if this be true, the first rail was thirteen feet from the nearest rail of the eastbound track. The driver sat seven or eight feet from the front of the bus, and he testified that if he had then known of the approach of the train he could have stopped the bus in time to have avoided the accident. His temporary blindness passed away before he entered upon the crossing, and he testified he continued to look to the right and left, but saw and heard nothing until an instant before the bus was struck. It is, therefore, obvious that the proximate cause of the accident was the negligence of the driver, even if the customary signals had not been given of the approach of the express train at the rate of fifty-eight

or fifty-nine miles an hour. If the driver had looked, he would have seen the train in time to have avoided the collision, so the death of the child was directly due to the negligence of the driver either in failing to look and so in time to see what was physically impossible for him not to have seen if he had looked, or in failing to stop after he had looked and seen in time to stop in a place of safety. *Pennsylvania R. Co. v. Yingling,* 148 Md. 169, 175-181, 129 A. 36.

While the negligence of the driver would not, under the circumstances of the record, be imputable to the passenger who was killed, yet, if the testimony does not establish some negligence on the part of the railway corporation which contributed to the wrongful death of the party, the railway corporation would not be liable as a joint tort-feasor.

As the testimony on the part of the plaintiff with reference to the ringing of the bells on the train and at the crossing, and the blowing of the whistle, is negative, under circumstances which make explicable the failure of the witnesses to hear, and there is convincing affirmative evidence of the operatives of the signals and of disinterested observers that the signals were properly given, and since the headlight on the engine was burning and was adequate and in good condition, and there was no legally sufficient testimony from which it could be inferred that those in charge of the control and management of the locomotive could, after the discovery of the peril of the occupants of the bus, have averted the accident by the use of reasonable diligence according to the circumstances, the defendant corporation is not shown to have been guilty of any act of negligence, unless it can be said that the rate of speed at which the train was traveling over the crossing was an act of negligence or that the operative conditions at the crossing when the accident occurred were in violation of law. 7-8 *Huddy Encyc. of Automobile Law,* sec. 28; *State, use of Morrow v. Washington, B. & A. Ry. Co.,* 145 Md. 285, 125 A. 538; *Klein v. United Rys. & Elec. Co.,* 152 Md. 492, 137 A. 306.

The rate at which the train was moving was not in excess of fifty-nine miles an hour. In the absence of statute or ordinance regulating the speed of trains at public crossings, the rate of speed which is reasonably necessary for a train in rapid transportation of freight and passengers and to make connections is not *per se* negligence. *Hatcher v. McDermott*, 103 Md. 78, 81, 63 A. 214; *Balto. & O. R. Co. v. State, use of Black*, 107 Md. 642, 662, 69 A. 439, 72 A. 340; *State, use of Silver, v. Philadelphia, B. & W. R. Co.*, 120 Md. 65, 75-77, 87 A. 492; *Klein v. United Rys. Co.*, 152 Md. 492, 505-507, 137 A. 306; *Sparr v. United Rys. Co.*, 114 Md. 316, 321, 79 A. 585.

The highway crossing was frequently used but it was not in an accurate sense a street crossing of the city. Its situation and nature are predominantly those of a country or suburban crossing highway. While the crossing was within the limits of an incorporated town, it was not at a center of population or business, but over a macadam highway on the outskirts of Rockville. For a long period express trains have been run over the crossing at high speed, and the public travel has been safeguarded by the use of timely automatic signals of the approach of trains; and a watchman from six o'clock in the morning until ten o'clock at night, which is the period of heaviest railway movement and of the greatest travel on the public way. When the watchman is not there, a red light confronts and warns the traveler, and a plain notice beneath the lights informs him of the hours the watchman is absent. The crossing bells begin to ring when the eastbound train is 3,578 feet from the crossing. Furthermore, the approach of the train at night is with a headlight burning and the bell ringing and whistle blown. All these precautions were taken and all these warnings were given at the time of the accident, and they furnished adequate and opportune warnings of approaching trains, no matter their speed. The crossing was one where a traveler would anticipate the passage of fast trains. It follows that, under these circumstances, a recovery cannot be had on

the speed of the train. *Supra; Newhard v. Pennsylvania Ry Co.*, 153 Pa. 417, 26 A. 105; *Cincinnati N. O. & T. P. Ry. Co. v. Commonwealth*, 126 Ky. 712, 104 S. W. 771; *Freedman v. New York N. H. & H. R. Co.*, 81 Conn. 601, 71 A. 901.

There is left the contention that, at the time of the accident, the railway company was guilty of a violation of statutory law which was designed for the protection of travelers at the crossing. The argument is advanced that the railway company is chargeable with negligence because there was a statute in operation which required the company, "in addition to the safety gates operated from the present or any tower," to have a flagman or signalman stationed at this crossing every day from 6 a. m. to 12 o'clock midnight to warn persons using the crossing of the approach of trains, and no one was to serve over nine hours during any day. The railway company was made subject to a fine of fifty dollars for every day of noncompliance. The legislation is set out in sections 846 and 847 of article 16 of the Code of Public Local Laws (1930, Flack's Ed.) under title of Montgomery County. The statute was first passed in 1906, ch. 221, as an amendment to article 16 of the Code of Public Local Laws, title "Montgomery County," subtitle "Rockville." The act required the company to keep a flagman or signalman at this crossing from 6 a. m. to 9 p. m., but did not attempt to regulate the hours of labor and prescribed no punishment for its violation. The Acts of 1910, ch. 96, repealed and re-enacted the Acts of 1906, ch. 221, in its present form. The hours of duty were lengthened to midnight, and the tour of service by the flagman or signalman was restricted to nine hours in a day; and, also, a fine was imposed for a violation of the statute and made collectible by the State of Maryland for the use of the public school fund of the county. The title of the amendment gave no intimation of the new provisions with respect to the hours of labor and of the penal provisions.

However, the General Assembly passed chapter 91 of the Acts of 1910, providing for a codification of all the

local laws of Montgomery County, including those which might be passed by that General Assembly, and for a submission of the codification to the following General Assembly. In chapter 790 of the Acts of 1912, the codification was submitted and adopted under the title of "An Act to repeal Article 16 of the Code of Public Local Laws of Maryland title 'Montgomery County,' and the several acts and parts of acts amendatory thereof, or inconsistent therewith, and to re-enact said Article 16 with amendments under appropriate sub-titles." In the codification thus made and enacted, chapter 96 of the Acts of 1910 was included. So, as has been recently decided, whatever defects of title may have existed in the prior statute, by reason of a failure in the title to meet the requirements of the Constitution of Maryland, the passage of the Code of Public Local Laws of Montgomery County, with the incorporation of the statute with the defective title, cured the defect in title of the codified statute, as the title of the statute enacting the Code complies with the provisions of section 29 of article 3 of the Constitution of Maryland. *State v. Coblentz*, 167 Md. 523, 526, 175 A. 340; *Dorchester County Commissioners v. Meekins*, 50 Md. 28, 40; *Lankford v. Somerset County*, 73 Md. 105, 108, 20 A. 1017, 22 A. 412; *Garrison v. Hill*, 81 Md. 551, 555, 32 A. 191; *Johnson v. Luers*, 129 Md. 521, 530, 99 A. 710; 59 *C. J.* secs. 376, 489, pp. 799, 892; 25 *R. C. L.* sec. 111, p. 867. So, it must be held that sections 846 and 847 of article 16 of the Code of Public Local Laws cannot be held illegal, because of defect of title, since the codification of 1912. It remains to be determined if these sections are invalid for any other reason.

Since the provisions of section 240 of article 23 of the Code of Public General Laws, which authorize the county commissioners of every county to determine the necessity for the protection of the public at railroad crossings over public highways, which are outside of the corporate limits of municipalities, by the alternative means of bell, gates, or flagman, do not apply to the incorporated town of Rockville, the General Assembly of Maryland

**600**

attempted to delegate, by what is commonly called the general welfare clause, the power of the municipality duly to regulate the safe-guarding of the public ways at railroad crossings. Code Public Local Laws (Flack's Ed.) art. 16, secs. 807, 834. At the same time that this general provision was incorporated in the Local Code of 1912, there were also incorporated the particular regulations of the chapter 96 of the Acts of 1910. These regulations were confined to a single legal entity, the Baltimore & Ohio Railroad Company, at a single specified crossing over a designated street. It was, therefore, not a general regulatory statute, and admitted of no other railway company to its operation. The effect, therefore, of the codification was to prescribe one inexorable form of regulation for the specified corporation, without the power of the municipality to change by ordinance; and to permit no regulation, or such as the municipality might conceive was advisable, with respect to any other railway, whether operating by steam or electric power, that would cross Baltimore Street or any other highway of the town, and no matter the danger of such other crossing to the users of the highway. The circumstance that the corporate defendant may now be the only railroad which crosses Baltimore Street may have constituted it the single member of a valid classification, and so prevent the statute from being discriminatory, but it is special legislation, and would be objectionable if the same subject-matter were within the scope of a subsisting general law on the subject. *Infra; Baltimore City v. United Rys. Co.*, 126 Md. 39, 54, 94 A. 378; *Police Pension Cases*, 131 Md. 315, 322, 101 A. 786; *Westminster v. Consolidated Public Utilities Co.*, 132 Md. 374, 378, 379, 103 A. 1008; *Prince George's County v. Balto. & O. R. Co.*, 113 Md. 179, 77 A. 433; *Baltimore v. Starr Church*, 106 Md. 281, 289, 67 A. 261; *Baltimore v. Allegany County*, 99 Md. 1, 57 A. 632.

The sections are, however, unreasonably discriminatory in reference to the hours of labor. The flagman or signalman at this particular crossing may not work more than nine hours during the course of a day, but flagmen or

signalmen of any other railway company, and even of the same railway company, employed at any other place, although engaged in similar duties and in similar situations, are not affected. The result is an arbitrary and unreasonable classification of the successive flagmen or signalmen at a particular place, imposing upon them and the employer regulations as to hours not imposed upon others similarly employed under substantially identical conditions. It will be observed that the operator of the gates at the crossing, which are contemplated by the statute, are not even made subject to the same provision. The act may, therefore, be said to be invalid because it is in denial of the equal protection of the law that is guaranteed by the Fourteenth Amendment of the Federal Constitution, providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *Sweeten v. State,* 122 Md. 634, 641, 90 A. 180; *State v. Potomac Valley Coal Co.,* 116 Md. 380, 399, 400, 81 A. 686.

In consequence of the invalidity of sections 846 and 847, article 16, there is no legally sufficient testimony which would tend to show that any negligence on the part of the railroad company contributed to the injury of which the plaintiff complained, and the two prayers offered on the part of the corporate defendant instructing the jury to render a verdict in its favor should have been granted. *Gross v. Wood,* 117 Md. 362, 368, 83 A. 337. Since the court at *nisi prius* let the case against the railroad company go to the jury on prayers which, on the assumption there was sufficient testimony, fairly, properly, and fully submitted the case, there is no reversible error on the prayers.

Nor is there found error in the rulings against the plaintiff on the admissibility of testimony. The question asked the town clerk whether he knew that before the accident the defendant corporation had been notified by the officers and authorities of Rockville as to the dangerous condition of the crossing was inadmissible. The question assumed a fact which was not in proof, nor accom-

panied by a proffer that would show its relevancy and materiality. It further related to an action, if ever taken, which would have been a mere expression of opinion upon a condition with respect to which the company was charged with knowledge and responsibility, and about which the jury was as competent to form and express an opinion as the undisclosed officers and authorities of Rockville. *Rowe v. Balto. & O. R. Co.*, 82 Md. 493, 501, 33 A. 761. Nor was there error in refusing to permit sections 846 and 847 of article 16 of the Code of Public Local Laws to be read in evidence. In the first place, the court takes judicial notice of public local laws, and their meaning and effect is to be given to the jury by the instruction of the court. In the second place, the sections were inoperative because they were invalid for the reasons which have been previously stated. Upon either ground the ruling was correct. *Balto. & O. R. Co. v. Welch*, 114 Md. 536, 543, 544, 80 A. 170. The admission of a photograph is largely in the discretion of the trial court, and, with the explanation given of the scene portrayed, there was no prejudicial error in its admission. *Maryland Electric Ry. Co. v. Beasley*, 117 Md. 270, 83 A. 157; *Baltimore v. State, use of Biggs*, 132 Md. 113, 103 A. 426; *Snibbe v. Robinson*, 151 Md. 658, 663, 135 A. 838; *Weiller v. Weiss*, 124 Md. 461, 464, 92 A. 1028. The refusal to let the engineer state whether the supply of sand for the engine had been exhausted before the accident was not error since, under the circumstances of the collision, the question was immaterial, as the lack of sand had no causal connection with the accident or death of the victim.

No reversible error is found to entitle the plaintiff to a reversal, and the verdict of the jury on the issues of fact submitted being in favor of the defendant corporation, and against the owner of the motor bus, the judgment will be affirmed.

*Judgment affirmed, with costs to the appellee.*