The appellant sued the appellee to recover damages for injury to its wagon and contents and harness, while crossing the tracks of the appellee at a point near Westport, Baltimore County, Md. The wagon was struck on a private crossing by an electric car of the appellee going south, at a speed of about forty-five miles an hour. The declaration alleges that the damage "was caused by the negligent mismanagement and lack of care used in the operation of the said car by the said employees of the defendant corporation." Although the motive power used is electricity, the cars on the appellee's road run rapidly between Washington, Baltimore and Annapolis, and the one in this collision weighed nearly forty tons. There is a tunnel north of this crossing one hundred feet long, then an open space of about one hundred feet and then another section of the tunnel about two hundred and fifty feet long and a retaining wall on the west side of seventy-nine feet. The section of two hundred and fifty feet is the one nearest this crossing, and the south end of that is three hundred and thirty-eight feet from the crossing. A person on the crossing can be continually seen from a point on the south-bound track about half a mile north of the crossing looking through the tunnel, but he can not see a car in the tunnel until he gets on the track. *Page 421 
The driver of the plaintiff testified that he had been crossing at that point every Saturday for seven months; that there was posted on the side nearest the Annapolis road "Railroad, Private Crossing, Cars Give No Warning for This Crossing, Beware," and on the other side "Railroad, Private Crossing". He testified "That when he first saw the car it was a good distance away, about six hundred or eight hundred feet, and had not reached the tunnel. The front wheels of his wagon were then inside of the rails of the out-bound track, and the horses had crossed it; that from the approach to the tracks he was always looking both ways; that there is no obstruction from the south end of the tunnel and the place where he stopped," which he said was about eighteen or twenty feet from the track. If the driver's version is correct, then there could have been no possible reason why he could not have cleared the track. If the car was going forty-five miles an hour, even if it did not lessen its speed after leaving the tunnel, it would have taken it ten or twelve seconds to reach the crossing from the point at which the driver said he saw it, and even if he was only going two miles an hour, he could easily have gone twenty-five or thirty feet in that time, which would have enabled him to have cleared the track if his wagon was where he said it was when he first saw the car. As he also said he at once whipped up his horses he must have been going more than two miles an hour for at least part of the time. Moreover, if the motorman had seen him in that position, when he was six hundred or eight hundred feet away, he certainly had no reason to suppose he would not get off the track which he could have readily done. So if the driver's theory be true there can be no recovery.
But the motorman swore "When I came through the tunnel I looked for the station, and seeing nothing, I went steady ahead as usual, and when I got near the south end of the tunnel I noticed this team being driven up on the crossing, the horses front feet about on the crossing; I immediately *Page 422 
threw my car into emergency, and put on sand and commenced blowing my whistle; and the driver evidently seeing his danger commenced whipping up his horses; that the crossing was in a slippery, slushy condition, and the horses did not get a proper hold, and the driver put the whip on them again and when they did get the proper hold, the car came in contact with the end of the wagon; the left side of the car struck the rear wheel of the wagon." The station referred to is what is called "Westport Station," which is simply a platform on each side of the tracks for passengers to get off and on and is not far from the crossing. It is what is spoken of as a flag station and the cars do not stop at it unless there is someone to get on or off. As the motorman approached it he looked to see whether there were any passengers, and there being none, he went on as was customary. The uncontradicted evidence is that the car stopped in two or three hundred feet after it struck the wagon, and that it takes from four hundred and fifty to six hundred feet to stop such a car going at the speed of forty-five miles an hour. The conductor and several passengers on the car testified that just as they got to the mouth of the tunnel the motorman blew the whistle and put on the brakes. A young lady who was a passenger said that she was thrown forward in the car by the application of the brakes. The testimony of the motorman shows that he did everything possible to avoid the collision.
So whether the theory of the driver or of the motorman be accepted, there can be no recovery under the decisions of this Court. The evidence showed that there was a snow six or more inches deep, which made the crossing more difficult than usual, but there was all the more reason for the driver using special care in going on the cross with which he was thoroughly familiar. Even in reference to public crossings it was said in Columbia,etc., R.R. Co. v. Huff, 105 Md. 34: "The law did not require them to blow a signal at the whistling post. The well-settled doctrine of this Court is that *Page 423 
while railroad trains have the right of way at public crossings, those in charge of the trains must give all proper and sufficient signals of their approach and take every reasonable precaution according to the character of the crossing to avoid collisions. The reciprocal duty of approaching a crossing with care is imposed upon travelers on the highway, and the more difficult and dangerous the crossing the higher is the degree of care required. It is negligence per se for anyone to attempt to cross the tracks of a railroad without first looking and listening, and also stopping for that purpose if the track is not fully in view at the immediate approach to the crossing." If the snow was calculated to impede the progress of the team, and it was impossible to see further than the mouth of the tunnel, and the approach of a car could not be heard, it would have been more prudent for the driver to have gotten off his wagon, gone to the track and looked through the tunnel, or else to have requested Mr. Cadden, who was near by, to see whether a car was coming. There are cases which hold that under such circumstances it is the duty of a driver, or someone in the vehicle, to get out and lead the horses over. Kinter v. P.R.R. Co., 204 Pa. 497;Mankewicz v. Lehigh Valley R.R. Co., 214 Pa. 386; Hook v.Mo. Pac. R. Co., 162 Mo. 569 (per opinion of ROLINSON, J.);Chicago Erie R. Co. v. Thomas, 155 Ind. 635, and others cited in them. But we do not deem it necessary to determine whether the failure of this driver to adopt that plan under all the circumstances of this case was such negligence as to preclude recovery, as we are satisfied that there was no negligence shown on the part of the defendant to entitle the plaintiff to recover.
It is well settled that there is no obligation upon railroad companies to give warning of the approach of trains to private crossings. In A. and B. Short Line R. Co. v. Pumphrey,72 Md. 82, there was a curve in the roadbed which prevented a person about to cross the tracks from seeing an approaching train until it got within thirty or forty yords of the crossing, and likewise prevented the employees on the engine from *Page 424 
seeing the crossing until within nearly the same distance of it, but it was held that it was not incumbent on the defendant to give signals of the approach of trains to that private crossing, and that the curve in the roadbed did not impose upon the company the duty of giving them. See also P. and B.R. Co. v. Holden,93 Md. 417; A., W. and B.R.R. Co. v. Hickox, 104 Md. 659. So although it could scarcely be claimed that there was any sufficient evidence to go to the jury in this case that the signals were not given, there was no such requirement at this crossing, under ordinary circumstances. The only possible reason for giving signals would have been after the team was discovered on the track, and the evidence is conclusive that they were then given, and if they had not been, it is difficult to see how that omission could have helped the plaintiff, as danger signals are only given to warn parties of the approach of a train or car, and the driver swore he saw this car six or eight hundred feet away, before it reached the tunnel. In Pumphrey's case, supra, it was said: "It is impossible to see how a railroad company can be held guilty of negligence because, in the construction of its line, it has made curves in the road bed. There are many conditions which render curves necessary. If the mere existence of them was held to be evidence of negligence it would be a most startling announcement indeed." The same may be said of tunnels — the one in this case being in part at least to prevent a grade crossing by two roads.
The evidence which we have already stated shows that the motorman did everything possible for him to do, after he discovered the team on the track. Md. Central R.R. Co. v.Neubeur, 62 Md. 391, CHIEF JUDGE ALVEY announced the doctrine of last chance in terms which can admit of no doubt. He said that in order that a plaintiff may successfully invoke the principle that if the defendant, or those acting for it, had become aware of the perilous situation of the plaintiff, though that peril had been incurred by the negligent or even reckless conduct of the plaintiff, it or its agents would be bound to *Page 425 
use all reasonable diligence to avoid the accident, "he must show knowledge on the part of the defendant, or its agents, of the peril in which he, the plaintiff, was placed, and that there was time after such knowledge, within which to make the effort to save him from the impending danger." Although that had apparently been modified in some cases by such qualification as "If the defendant's motorman could have avoided the accident by the exercise of due care after he saw or ought to have seen the plaintiff's peril," or something to that effect, Kolken's case,114 Md. 160, Sparr's case, 114 Md. 316, and the still later one of State, use Silver, v. P., B. W.R.R. Co., 120 Md. 65, have pointed out the difference in the application of the rule to railroad trains and cars running in cites, or thickly populated places, where it is the duty of those in charge of the cars to be on the constant lookout, to anticipate the approach of persons to the tracks and to keep the speed of the trains or cars under control, from that in the country or sparsely settled places. As we quoted in Silver's case from what was said by JUDGE THOMAS in Sparr's cases "The appellant relies upon the class of cases to which the recent case of United Railways Electric Co. v.Ward, 113 Md. 649, and the case of United Railways ElectricCo. v. Watkins, 102 Md. 267, belong. But as has been frequently stated by this Court, those cases have no application to accidents occurring in the open country where cars are known and permitted to run at much greater speed than is permissible on the crowded through-fares of the city, where those in charge are not required to reduce the speed of the car as they approach a road crossing, and where more caution is therefore demanded of persons in crossing the tracks."
The accidents involved in those cases were at public crossings, while this one was at a private crossing, for which there is of course still less reason to require the motorman to anticipate the approach of travelers or to reduce his speed. It would be impossible for cars or trains to cover the distance *Page 426 
between such points as Baltimore and Washington within the time demanded by the traveling public, if the speed was required to be sleckened at every public crossing, and if such requirement was made at every private crossing rapid transit would virtually be put an end to in some localities. It is to be hoped that the time will come when many of the existing grade crossings in this country will be eliminated, but that can scarcely be hoped for in case of private crossings until the most dangerous public ones are gotten rid of.
It only remains to consider briefly the other exceptions. The first, second and third were abandoned. The question in the fourth was: "Mr. Krause, do you know whether that road was there before the railroad company came there?" And that in the fifth: "Do you know how long before the railroad came there that road was used?" Both of those questions were wholly immaterial. The driver had testified that the road "is the only way he can get to the residences of Messrs. Church and Krause, a double house, the residence of Mr. Peterson, and a negro shanty in which several families lived." And the evidence shows that it is a private road. What possible difference could it make whether the road was there before the railroad was built? If it was, presumably the right to cross was acquired by purchase, condemnation or in some way. The other question is equally immaterial, and is also objectionable because it assumes that the road was used before the railroad came. The question in the sixth bill of exception was "Do you know in what way the road has been used by the public, and for how long?" That was objectionable, if for no other reason, because it assumed that it had been used by the public. The question in the seventh bill of exceptions was "Do you know what the condition of the ground was on this Saturday the accident took place?" Very little of the answer was responsive to the question. It was, however, permissible to prove that there was snow on the ground and that part of the answer ought not to have been stricken out, but that was amply proven by other witnesses *Page 427 
and was not controverted. So there was no reversible error in the ruling. In the eighth bill of exceptions the ruling of the Court in refusing to admit two deeds, offered for the purpose of proving that a right of way twelve feet wide existed from the property on which Krause lived to the public road was presented. We do not understand the materiality of that evidence. It was not denied that there was a private road over the railroad. Indeed the driver testified to the notices above spoken of which were apparently placed there by the railroad company. Moreover, the deeds are not in the record and for aught we know the Court examined them and found that no such right of way existed. In their absence from the record the ruling of the Court will be presumed to be correct. Gent. v. Lynch, 23 Md. 58; Miller
v. Miller, 41 Md. 623, and Ridgely v. State, 75 Md. 510. The ruling in the ninth exception was likewise correct. It was not at all material to show "What was the condition of that crossing as far as grade was concerned before the railroad company ran its tracks through there?" The rulings in the tenth and eleventh exceptions were clearly right.
As the Court granted an instruction at the conclusion of the case "That there is no evidence legally sufficient to entitle the jury to find that the defendant failed in the performance of any of the duties which it may have owed the plaintiff, as alleged in the declaration, and their verdict therefore, must be for the defendant upon the issues joined in the pleadings," and as we are of the opinion that that prayer was properly granted, it is unnecessary for us to discuss at length the exceptions to the rulings on the admissibility of the evidence, as any different rulings on the evidence could not have affected our opinion. If any errors were committed they were therefore harmless and can not be complained of in this appeal. McCay Co. v.Crocker-Wheeler Co., 100 Md. 530.
Judgment affirmed, the appellant to pay the costs. *Page 428