ROSE KLEIN *v.* UNITED RAILWAYS AND ELECTRIC COMPANY.

*Collision at Railroad Crossing—Blowing of Whistle—Evidence —Speed of Train—Crowded Highway—Contributory Negligence.*

In an action for injuries to a passenger in an automobile, which was struck by defendant's suburban electric car at a road crossing, plaintiff's testimony that the motorman of the car "did not blow his whistle," *held* insufficient to carry the question to the jury, such testimony necessarily meaning merely that she did not hear it, she subsequently making the latter statement, she having been on the back seat between others, and the driver and two others of her witnesses, as well as numerous witnesses for defendant, testifying that the whistle was blown. pp. 502-504

Furthermore, in view of the testimony of the driver of the automobile, that he saw defendant's car, and heard the whistle in time to have stopped in a place of safety, whether the whistle was blown was not material to the issue of defendant's negligence.                                                   p. 505

At a country road crossing, a train has the right of way, and one approaching it in an automoboile has no right to assume that it will surrender that right and stop until he crosses in front of it.                                                   p. 505

The motorman of a train on a suburban railway, approaching a country road crossing, was not negligent in assuming that the driver of an automobile would not leave a place of safety and attempt to cross the tracks directly in front of an oncoming train.                                                   p. 505

Where a railroad runs through an open country on a private right of way, over a track constructed for the passage of trains at high speed, a train has the right of way at a highway crossing, and negligence is not to be inferred from the fact that it travels at a high rate of speed when it approaches such a crossing.                                                   pp. 505, 506

It was immaterial in this connection that, at the particular crossing, the tracks were level with the roadbed, as in a city, that structures fronted the road in the neighborhood of the tracks, that it was Sunday, when the road, an important artery, "swarmed" with traffic, and the automobile in which plaintiff was riding was one of a continuous procession, and that the crossing was a recognized stopping point to discharge and take on passengers.                                                   pp. 506, 507

The alleged act of the motorman in first lessening the speed of the train as it approached the crossing, and then increasing it, was immaterial, the driver of the automobile in which plaintiff was having testified that the speed of the train was terrific, and that it did not slow down, and plaintiff herself having testified that she did not see the train until it was "right on top" of her, it thus appearing that neither was misled by any slowing down of the train.                                                   p. 507

*Decided March 3rd, 1927.*

Appeal from the Baltimore City Court (DUFFY, J.).

Action by Rose Klein against the United Railways and Electric Company of Baltimore. From a judgment for defendant, plaintiff appeals. Affirmed.

The cause was argued before URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Harry O. Levin,* with whom were *Levin & Lichtenberg* on the brief, for the appellant.

*J. Pembroke Thom* and *Walter V. Harrison,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This case grows out of a collision between an automobile in which Mrs. Rose Klein, the appellant, was a passenger, and a train owned and operated by the United Railways and Electric Company, the appellee. The accident occurred at about four o'clock in the afternoon of July 5th, 1925, at the intersection of the North Point Road with appellee's single track railway, about one and a half miles from Bay Shore Park, in Baltimore County. The railway tracks at the crossing are of "tram" construction, similar to that used in the ordinary city street, are flush with the road, and the road itself is level there. On either side of the crossing the tracks are of "T" rail construction and for a distance run through a "cut" several feet below the surface of the adjacent land.

At the time of the accident, Mrs. Klein was a passenger in a Studebaker sedan automobile owned and driven by her brother-in-law, Harry A. Goodman, which was proceeding southerly along the North Point Road towards Bay Shore Park. As the car approached the crossing, Mr. Goodman, the driver, was on the left front seat, Mr. George Klein, appellant's husband, was on the right front seat, and with them was Mr. Goodman's "little boy, Stanley." Mrs. Klein was

seated in the middle of the rear seat, with Miss Lillian Good-
man on her left, and Miss Anna Goodman on her right, and
with them was a child two and a half years old.

As the automobile approached the crossing, Goodman saw
the train approaching from his left about three hundred feet
away, but he continued his course and started over the tracks,
but before he cleared them the train struck the automobile,
dragged it for some distance, and overturned it.   As a result
of the collision, Mrs. Klein was seriously, painfully and per-
manently injured, and on October 7th, 1925, she brought
this action against the appellee in the Baltimore City Court
to recover compensation for her injuries, on the theory that
they were occasioned by its negligence.   At the conclusion
of the trial of the case the court directed a verdict for the
defendant, and from the judgment thereon the plaintiff ap-
pealed.   The only question submitted by the record is whether
the court erred in that ruling, and in dealing with that
question it becomes necessary to review and value so much
of the evidence as tends to support the plaintiff's claim.

The crossing is, as we have stated, formed by the inter-
section of the North Point Road, running at that point ap-
proximately north and south, and the tracks of the appellee
running east and west.   So far as the record discloses, it is
in the open country, and the construction of the railway on
either side of it appears to be adapted to the operation of
railway cars at high speeds.   For a distance of something
over two hundred feet north from the railway tracks, the
bushes on the east side of the road are cut away, so that one
approaching the crossing along the North Point Road from
the north, when two hundred feet from the crossing, had an
unobstructed view of a car coming west for four hundred feet
east of the crossing, and as he got nearer the track his view
lengthened, until at a distance of fifty feet from the track
he could see a car approaching from his left for six hundred
feet.   A plat filed by agreement in this court indicates that
adjacent and east of the crossing is a landing for passengers,
on the north side of the tracks, and some distance farther

to the east is a whistling post. The same plat indicates that the highway is about sixteen feet wide, and that four warning signs indicating danger and a railway crossing are located north of the crossing on the west side of the road, at irregular intervals, the most distant being five hundred feet from the tracks.

The evidence is conflicting, but resolving all conflict in favor of the appellant, and giving her the benefit of all inferences which could naturally and legitimately be drawn from it, it nevertheless conclusively shows that the accident must have happened in one of two ways, and the question before us is whether in either case the plaintiff was entitled to recover.

The appellant's contention is, and there is evidence to support it, that the street car approached the crossing at a "terrific" rate of speed, that, as it approached, a "procession" or "parade" of automobiles also approached it, proceeding slowly and with a comparatively short space between the cars, that the railway cars were accustomed to stop at the crossing to take on or discharge passengers, that the North Point Road at that crossing is a heavily travelled state road, and that the "procession" of automobiles was steadily, in full view of the motorman operating defendant's car, crossing in front of it, with no break or "opening," and that under such circumstances Goodman, who was operating the automobile in which appellant was a passenger, was justified in assuming that the motorman would reduce the speed of his car or stop, so as to permit Goodman to cross the tracks in safety.

The appellee's contention, on the other hand, is that its car approached the crossing at a moderate rate of speed, that it gave sufficient warning of its approach, and that, as it approached, the motorman saw the "'procession" approaching the crossing, and reduced the speed of his car, but, having given warning of his approach, he assumed that persons operating the automobiles would not leave a place of safety and place themselves in front of an oncoming railway train,

and increased his speed as he approached the crossing, and that he did not realize, until too late to avoid the collision, that Goodman intended to drive over the tracks in front of the car, and that no negligence should be attributed to the motorman for acting on that presumption.

The conflict in the evidence related mainly to the speed of the car as it approached the crossing, and as to whether the motorman, after first reducing its speed, increased it again just before he reached the crossing. Appellant also suggests that there was testimony that no warning was given, but an analysis of the evidence fails to support that contention, to which we will refer later.

Mrs. Klein, the appellant, testified that when the automobile in which she was riding was one hundred and fifty feet from the crossing, she looked for approaching "street cars," but saw none, and did not look again until she heard "the whistle and saw the car at the same time," when the automobile was on the tracks; that the "motorman did not blow his whistle until he was almost on top of the machine"; that she did not "hear" any whistle until he was on top of the machine; that the car was coming at a terrific speed, and that the motorman looked as "if he wanted to slow down, but he was going so fast he could not slow down"; that there was quite a string of cars approaching the crossing, and the one in front of the Goodman automobile was about ten feet from it, and it "got across all right," that "there are no houses or fences or buildings nor trees or woods, that is open country."

Harry A. Goodman, who was driving at the time of the accident, testified that he and his family were bound for Bay Shore Park, and that his automobile was part of a parade or procession of automobiles going south on the North Point Road; that when he was about two or three hundred feet from the crossing, he looked both ways and saw and heard nothing, that when he got about fifty feet from the tracks he looked to his left, and saw the railway car approaching, and at the same time he heard the whistle; that the car was

then about three hundred feet away, evidently going at a
terrific speed. He further testified that, when he was fifty
feet away from the track, the same procession of automobiles
was in front of him leisurely going across the railroad track;
that he could only watch the automobile in front of him;
that he was about two or three automobile lengths from the
tracks when the street car was three hundred feet ahead;
that while he was looking and saw this car about three hun-
dred feet away, the automobiles in front of him were con-
tinuing across, and he was following leisurely along, and he
figured that the motorman of the car, seeing that procession,
would probably come to a dead stop or slow down enough
to avoid anything; that the line of cars did not come to a
stop, but kept on going, even after the car was approaching
about three hundred feet; that there was nothing to prevent
the motorman in the car from seeing these cars going across
there, that the last time he looked was about fifty feet from
the track; that before he arrived at the track—that before
he got on the track—he looked again; that just within a few
feet of the track he always looked, and then when he got
on the track, that instant he was struck, "and the car bore
down on us, he evidently was going at a terrific speed"; that
when he looked before he got on the track the distance of the
car, he guessed, had been one hundred and fifty feet; that
the automobile which had been in front of him was just
about leaving the track; and the street car was about one
hundred and fifty feet; * * * that it looked to him when he
was on the track, the distance that the car came from, the
distance it was at that particular moment, he guessed that
was about one hundred and fifty feet, and he may have
tried to put on a little gas to get across quicker, and evi-
dently he did, because the car struck them a little beyond the
rear door, just about at the rear wheel on the left side; as
he was going across the track his object was to get across as
soon as he possibly could; as soon as he saw the street car
there was nothing else he could do but that. He said that
when he heard the whistle and saw the car he could not

judge its speed, because he had to watch the "car ahead of him"; that he thought, when the motorman saw "the procession going across there," he would stop or slow down to protect "anybody going across"; that in all his "previous experience going across that crossing" the street car has always stopped before it passed that crossing, or slackened down "sufficient like if it was coming to a stop." When asked, "You thought because the car ahead of you was getting over safely that you had a right to follow it and get over safely"; he said, "The way the situation appeared at that time, I thought I could make it safely." He further said that he approached the tracks at from ten to fifteen miles an hour, and that at that speed he could stop his automobile in a car length easily.

Anna and Lillian Goodman both testified, but recalled nothing that is material about the accident.

George Klein, who was on the front seat with Goodman, in part testified: "We were on our way to Bay Shore, and there were several cars in front of us. In fact, there was a steady stream. Just before we approached this crossing, I should judge around four or five hundred feet, to my best judgment of distance, we noticed or saw the train, the car, coming down the track, and we kept right ahead, in fact, there were several cars in front of us, and just about the time the front wheels went over the railroad track, that is about the last I can remember"; that before they got on the track, it seemed they had plenty of time to cross it; just how many feet he didn't know—that he is not a very good judge of distance. That right before going on the track, it looked like it was a pretty good distance away; it looked as if they had plenty of time to cross the track, the automobile in front of him he imagined was about ten or twelve feet in front of them—that this car that was in front of them passed right over the track; that there had been no stop at all before they got to the car track; that there were automobiles going both directions, at the time they approached the car track. He further said that it "is a pretty open country around there

and that it was coming at a pretty good rate of speed, pretty fast," that he did not remember whether he "heard the whistle or not."

Albert Collison, who lived about two hundred and fifty feet from the crossing, and was standing on his porch when the accident happened, said that at the time there was a continuous line of traffic, "it was so thick you could not cross the road," automobiles going to and coming from Bay Shore, that he "knew the crossing"; that "it is a stop for the street railway to take on passengers and discharge passengers"; that he has seen it stop there, that he got on there this morning himself; that "if no one is to get on or off the car it goes along. It is a pretty well used road"; that he heard the whistle when the railway car was three hundred feet from the crossing, that he heard it before he saw the car, that he could not see whether the railway car was going fast or slow. He does not appear to have actually seen the accident, but heard the crash. He was watching the traffic, "watching the string of machines to see if they were going to make an opening for the street car to go through, which as a rule they generally do."

Philip Foxman, Goodman's brother-in-law, was driving an automobile about fifty or seventy-five feet behind the Goodman car. He testified that he saw the "street car" about three hundred feet from the crossing when he was seventy-five feet from it, and that when the Goodman car was hit, he, Foxman, stopped twenty-five or thirty feet from the track; that the automobiles were going at a speed of from fifteen to twenty miles an hour; that before the accident there was no "stop in the automobiles, that they just kept going," and that the street car was approaching at a rapid rate of speed.

William E. Hughes, who also lived on the North Point Road, about two hundred and sixty feet further away from the crossing than Collison, testified that he was familiar with the crossing, that cars always stop at the crossing, that just before the accident he had been on his front porch, and had noted that the traffic was very heavy, moving at a moderate rate of speed, and he saw the street car when it was about

one hundred or one hundred and fifty feet from the crossing, and at that time it was slowing down, and he "went in"; that before it slowed down "it was going at a speed of about thirty-five"; that the automobiles continued to go across, to go ahead. On his cross-examination he said that some north bound machines had stopped at the crossing, that the whistle was blowing continuously from the time the car was five hundred feet from the crossing until it hit the automobile.

On behalf of the defendant, Fiola Shapiro testified that she was in an automobile going from Bay Shore to Baltimore, and that as it approached the crossing, when the railway car was about five hundred feet from the crossing, she heard the whistle blow, that it was blowing very loudly "the whole length, five hundred feet, down to the crossing"; that when the Goodman car was one hundred feet from the track, the space between it and the track was clear, and that when it got on the tracks she did not think the street car was more than twenty or twenty-five feet away.

Frank Gladsky, the conductor, said that the whistle was blown "continuously" from a point fifty feet east of the whistling post until the train reached the road, that after the train passed the whistling post the speed of the train was decreased, that "as they approached the road, say about seventy-five feet from the road, he felt the motorman apply the air to the car as if to stop, and it attracted his attention to the front of the car, and then he noticed a car near the track, and it was slowing down, and the motorman was slowing down too; then he released the air and started to speed up again, he was watching the automobile, and he slowed down, and the motorman released the air and started to speed up, and so did the machine; that he guessed that when the automobile was about twenty feet away from the track, the motorman tried to slow down, applied his brake, and he supposed he could not stop the car in time and hit the machine." He also said that they "always" stopped at the road to receive and discharge passengers, but that they did not receive and discharge passengers every trip, that as the train or street car approached the road it was going at about fifteen miles

an hour; "that the automobile was going at about the same rate of speed; that the automobile continued to come and sort of slackened up and the car did the same thing; that the automobile came right on after it slackened—started off again; that he started right off again; that when he started right off, he judged it was about twenty feet from the track; that his car "was then about twenty or twenty-five feet from the intersection; yet the automobile got on the track before you arrived at the crossing."

Alva Coats, the motorman, said that he was operating a train, composed of two cars, each about forty-five feet long, and weighing twenty-six tons; that as he approached the whistling post he cut off his current, and blew the whistle; that he saw automobiles passing to and fro over the crossing, and he noticed one special automobile, and as he got nearer he slowed down and they slowed down, and as he did that the driver of the automobile threw his left hand up on the side, and that he, the witness, then speeded up, and the driver of the automobile speeded up at the same time, and witness then cut off his power and applied his brakes; that at the time he was going about twelve or fifteen miles an hour, although his schedule called for a higher speed, and at that speed can stop his car in from sixty-five or seventy feet; that his schedule calls for a higher speed than that, but that the reason for his slowing down was to watch out for the traffic, and to be ready to stop to take on or discharge passengers, as that was a usual place for them to get on and off the cars; that on that occasion there was a continuous parade of automobiles.

The testimony of this witness was in substance corroborated by Chester Hall and Mrs. Marian Yeatman.

Appellant in his brief states that from the testimony to which we have referred it may be fairly inferred that "no whistle was blown until the time of the actual impact," but we cannot accept that conclusion. It is true that Mrs. Klein in her testimony says that the "motorman did not blow his whistle until he was almost on top of the machine," but it is apparent that what she meant by that was that she did not hear the whistle until that time. Because not only did she

herself later say that "she did not hear any whistle until he
was on top of the machine," but no other witness corroborated
her.  On the contrary Goodman, the driver of the automobile,
Collison and Hughes, all witnesses for the plaintiff, testified
positively that the whistle was blown when the train was over
two hundred feet from the crossing, and they were corrobo-
rated by Miss Shapiro, Gadsky, the conductor, Coats, the
motorman, Chester Hall and Mrs. Marion Yeatman, wit-
nesses for the defendant, all of whom testified that they act-
ually heard the whistle blown.  In the face of the positive
and direct evidence of her own witnesses, as well as those of
the defendant to the contrary, it is incredible that Mrs. Klein
meant by her testimony to go any further than to say that
she had heard no whistle until the impact, and that was prob-
ably true.  She was in the rear seat between two other per-
sons, she looked out for approaching cars when the automo-
bile was 150 feet from the tracks, and appears to have paid
no further attention to the crossing, although she knew where
it was, until struck by the train, and Miss Lillian Goodman,
who was sitting with her, said that she was not prepared to
say whether the whistle blew or not.  Under such circum-
stances the rule stated in *Ballo. & O. R. Co. v. Roming,* 96
Md. 67, applies rather than that stated in *United Railways
Co. v. Crain,* 123 Md. 339.  In the latter case Judge Patti-
son, after a very full and careful analysis of the cases, said:
"It may be safely stated, from the above cited authorities and
others, that where the attention of those testifying to a nega-
tive was not attracted to the occurrence which they say they
did not see or hear, and where their situation was not such
that they probably would have observed it, their testimony is
not inconsistent with that of credible witnesses who were in
a situation favorable for observation and who testified af-
firmatively and positively to the occurrence."  In the *Crain*
case, *supra,* we held that the testimony of a witness that a
warning was not given, and of others that they did not hear it,
was sufficient to take that question to a jury, because it ap-
peared there that at least two of the witnesses who gave that
testimony were, as they approached the crossing, constantly

on the look out for approaching trains, and that if a warning had been given they would probably have heard it. In this case the statement of Mrs. Klein, that the whistle was not blown could not possibly have meant anything more than that she did not hear it, for there is nothing to indicate that she was in a position to know as a fact whether it blew or not, she was certainly not watching, and it does not appear that she was listening, and such evidence was not enough to carry the question to the jury against the positive testimony of every other witness in the case who professed to have any knowledge of the matter, including the driver of the automobile in which she was riding, that it was blown.

The appellant's contention that the facts which we have stated are sufficient to justify the inference that her injuries were occasioned by the defendant's negligence necessarily rests upon the proposition that the crossing at which the collision occurred was not a country road crossing such as was involved in *United Railways Co. v. Crain, supra.* For if it is such a crossing, then the only duty resting upon the appellee in operating its trains over it is that stated in the *Crain* case, where it is said: "The evidence shows that the crossing was one of more than ordinary danger, and therefore required the exercise of more than ordinary care, both on the part of parties attempting to cross the tracks of the railroad, and of the managers of passing trains. This duty is mutual and reciprocal, and not confined to one party only. The railroad trains, from the nature of things, have the precedence of passing the crossings of public ways unobstructed; but it is the duty of those directing the trains to be careful to give all proper and sufficient signals of their approach, and to take all reasonable precaution, in view of the nature of the crossings, to avoid collision. Failure in the strict performance of this duty to the public, whereby injury is inflicted upon individuals, will subject the company to liability to respond in damages to the injured party." And whether the whistle was or was not blown is not, under the facts stated, material to the issue of negligence *vel non,* be-

cause in this case the driver of the automobile said he saw the car, and heard the whistle in time to have enabled him to stop in a place of safety had he chosen to do so.

"The negligence alleged and the injuries sued for must bear the relation of cause and effect." *Benedict v. Potts,* 88 Md. 54. And even if it be conceded that the motorman was negligent in failing to give warning of the approach of the train, that negligence did not injure the plaintiff, if the driver of the automobile actually saw the approaching train, for the whistle could have conveyed no more striking warning than the sight of the car itself. *Winter v. United Rwys. Co.,* 115 Md. 72; *Capital Traction Co. v. Contner,* 120 Md. 85; *Westerman v. United Rwys. Co.,* 127 Md. 230; *Upton v. United Rwys. Co.,* 136 Md. 217. And if the crossing was a country road crossing, the train had the right of way, and Goodman on the one hand had no right to assume that it would surrender that right and stop until he crossed in front of it, nor on the other hand was the motorman guilty of negligence in assuming that Goodman would not leave a place of safety and attempt to cross the tracks directly in front of an oncoming train. *Heying v. United Rwys. Co.,* 100 Md. 283. Nor can negligence be inferred from the fact that the train was moving at a "terrific" speed, whatever that indefinite and uncertain expression may mean, or that it was going at the rate of thirty-five miles an hour, because the mere running of a train at a high speed over a country crossing is not in itself evidence of negligence. *Balto. & O. R. Co. v. Black,* 107 Md. 662. And it is a matter of general knowledge that cars, whether propelled by electricity or steam, may and do operate at higher speeds in the open country than on city streets. *Westerman v. United Rwys. Co.,* 127 Md. 231; *Sparr v. United Rwys. Co.,* 114 Md. 321. And, as pointed out by Chief Judge McSherry in *McNabb v. United Rwys. Co.,* 94 Md. 727, the motive power is an immaterial incident, but the existence of negligence in the speed at which cars are operated depends upon such circumstances as the nature of the country through which they run,

and the character of the construction of the railroad. And where the railroad runs through an open country on a private right of way, over a track constructed to permit the safe passage of trains at high speeds, in the very nature of things the operation of trains at such speeds is not only permissible, but in many instances essential, unless the commercial and industrial business of the country is to be brought to a standstill. And, since trains operating under such conditions have the right of way at highway crossings (*United Rwys. Co. v. Crain, supra; Steil Brewing Co. v. Wash., B. & A. R. Co.,* 120 Md. 423), it follows that negligence is not to be inferred from the mere fact that the train referred to in this case was travelling at a high rate of speed when it approached the crossing, if that was a fact.

But appellant contends that, while that may be true under some circumstances, it is not so in this case, for a variety of reasons which her counsel in a very careful and fairly stated brief summarize as follows: "1. The construction of the tracks at the crossing is level with the roadbed, as in city construction. 2. A number of structures front the road and immediate neighborhood of the tracks. 3. The accident occurred on Sunday, a holiday, and the road swarmed with vehicular traffic bound in both directions. 4. The intersection is a well-known stopping point to discharge and take on passengers. * * * 5. The road is an important artery and traffic conditions on Saturdays, Sundays and holidays are always very heavy, especially during the summer months. * * * 6. That the continuous line of traffic (at time car approached) was so thick the road could not be crossed." But obviously the circumstances referred to have no substantial force. Under current conditions on every Sunday, Saturday, and holiday, public highways everywhere are thronged and jammed with thousands of automobiles, and it is a matter of common knowledge that on such days the highways connecting large cities, such as Baltimore and Washington, or leading to amusement resorts, are so crowded with automobiles that they do appear to form an apparently

continuous parade or procession.   It is a matter of common knowledge, too, that railways everywhere run through or by villages, towns, hamlets, and stations.   But it has never been supposed that persons operating railway trains were obliged under such circumstances to reduce the speed of their trains, or stop them entirely, to permit automobiles approaching the crossing to pass in front of them, or to slacken their speed or stop at every hamlet, village, or station along the route on all occasions, but on the contrary the rule is that persons operating a train are justified in assuming that others approaching a crossing, over which it is about to pass, and who are at the time in a place of safety, will remain there until it has passed.   *Sparr v. United Rwys. Co.,* 114 Md. 321; *Steil Brewing Co. v. Wash., B. & A. R. Co.,* 120 Md. 422; *Tilghman v. New York., P. & N. R. Co.,* 127 Md. 679; *State etc. v. Wash., B. & A. R. Co.,* 145 Md. 290.

The only other possible suggestion of negligence is that the act of the motorman in first lessening the speed of the train as he approached the crossing, and then increasing it, may have misled the driver of the Goodman car to believe that it would stop before reaching the crossing, but whether that method of operating the train could be called negligent is, upon the facts of this case, wholly immaterial, because the driver of the car himself said that the speed of the train was terrific, and that it was not slowing down.   If that was the impression it made on him, it is evident that he at least was not misled by any slowing down of the train, and the plaintiff herself was not misled because she did not see the train at all until it was "right on top" of her.

It follows from what has been said that we have been unable to discover any legally sufficient evidence of negligence on the part of the appellee, and in our opinion there was no error in the rulings of the trial court involved in the only exception submitted by the record, and the judgment appealed from will therefore be affirmed.

*Judgment affirmed, with costs.*